IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACLYN C. OAKLEY | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | NO. 09-CV-02776 |
| ORTHOPAEDIC ASSOCIATES OF ALLENTOWN, LTD, et al. | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

O'Neill, J.  September 28, 2010

**I. Introduction**

Plaintiff Jaclyn Oakley is a certified athletic trainer and a member of the Church of God, a Christian denomination that observes the Sabbath as described in the Old Testament. Defendants are Orthopaedic Associates of Allentown ("OAA"), a provider of orthopaedic care, and individual defendants including OAA's chief operating officer, Vincent Hudson, its director of athletic training services, Linda Stout, and its human resources director, Maryanne Nastasee. Following her termination in October 2008, plaintiff brought suit for employment discrimination under Title VII of the Civil Rights Act and the Pennsylvania Human Relations Act, alleging that she was terminated because of her religion; that OAA terminated her employment in retaliation for her requests for an accommodation of her religious beliefs; and that OAA failed to provide her with an appropriate accommodation that would have allowed her to observe the Sabbath and various Holy Days. OAA counterclaimed for breach of plaintiff's employment contract.

Defendants have moved for summary judgment against plaintiff as to all of her claims

and for judgment in OAA's favor on the counterclaim. Summary judgment will be granted in favor of defendants as to plaintiff's disparate treatment and retaliation claims. Summary judgment will be denied as to plaintiff's failure to accommodate claim. Summary judgment will be denied without prejudice as to plaintiff's remaining claims and OAA's counterclaim.

## II.  Standard of Review

Summary judgment should be granted if the record, including pleadings, depositions, affidavits, and answers to interrogatories, demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making that determination, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The question is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  It is not the role of the trial judge "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial," *id.* at 250, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.  At "the summary judgment stage, 'all that is required [for a non-moving party to survive the motion] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve [at trial] the parties' differing versions of the truth.'" *Jackson v. Univ. of Pittsburgh*, 846 F.2d 230, 233 (3d Cir. 1987), quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

**III. Factual Background**[1]

OAA employs two types of certified athletic trainers ("ATCs"): Outreach ATCs, who work on site at schools and provide services during team practices and athletic events and Clinical ATCs, who treat patients at OAA's Allentown facility. (Defs.' Statement at 5-7). The clinic is open on Mondays through Fridays, and also on Sundays during football season. (Defs.' Statement at 7). When outreach ATCs work in the clinic on Sundays during football season, they are paid $35 for roughly two hours of work. (Pl.'s Resp. at 45).

Although most Outreach ATCs work full time in schools, some districts pay for a part time ATC to service middle schools. Those part time ATCs who work in middle schools also work in the OAA clinic in the mornings, as middle school sporting events tend to require less time than their high school counterparts. (Pl.'s Resp. at 6, 46).

Plaintiff began working for OAA as an Outreach ATC in June 2007, following the completion of her graduate education. (Pl.'s Counterstatement at 2). Plaintiff signed a lengthy employment contract with OAA, which she did not take home to review prior to signing. (*Id.*) She did not receive a copy of the contract. (Pl.'s Counterstatement at 4). Plaintiff signed a renewal of her employment contract, again without taking it home or submitting it to review by an attorney, in June 2008. (Pl.'s Counterstatement at 18). The contracts permitted OAA to determine plaintiff's responsibilities and time commitment, but did not specify which days or hours she was to work. (Pl.'s Resp. at 12). The contracts provided that if plaintiff failed to satisfy her obligations under the agreement she would be required to pay OAA liquidated

---

[1] Three sources are referenced in this section: defendants' statement of undisputed facts; plaintiff's counterstatement of undisputed facts; and plaintiff's response to defendants' statement of undisputed facts. All citations to defendants' statement are to facts which plaintiff admitted and are undisputed, unless otherwise noted.

damages in the amount of 20% of her base salary. (Defs.' statement at 13).

Plaintiff was assigned to work at Saucon Valley High School in Hellertown, Pennsylvania. (Pl.'s counterstatement at 7). She reported to both Linda Stout, OAA's director of athletic training services, and the athletic director of Saucon Valley School District, Robert Frey. (Pl.'s counterstatement at 8). She was required to cover all high school and middle school sports, which included both games and practices. (Defs.' statement at 18). Plaintiff worked 35 hours per week during the fall and winter seasons in 2007-2008, including Fridays after sundown and some Saturdays. (Defs.' statement at 18, 20-21). During the 2008 spring season, her hours were the same. (Defs.' statement at 22).

Plaintiff had a successful tenure at Saucon Valley between her hiring in June 2007 and June 2008. (Pl.'s counterstatement at 14). She received excellent performance evaluations, and worked well with athletic director Robert Frey. (*Id.*) Although plaintiff was the only athletic trainer assigned to Saucon Valley when she began working for OAA, an additional ATC, Erin McCormick, was added in 2007. (Pl.'s counterstatement at 16). Plaintiff and McCormick were permitted to work out their schedules and division of labor at the school district without input from their supervisor, Stout. (Pl.'s counterstatement at 17).

In or about July 2008, Plaintiff became an active member of the Church of God. (Pl.'s counterstatement at 19). On or about August 19, 2008, plaintiff emailed Stout to advise Stout of her conversion, and to explain her objection to working on the Sabbath and on other Church Holy Days. (*Id.*) Prior to emailing Stout, plaintiff had agreed with McCormick that McCormick would cover any events that took place on Friday nights and Saturdays. (Pl.'s counterstatement at 20). In return, Plaintiff worked late on Monday through Thursday evenings. (*Id.*)

4

Shortly after advising Stout of her conversion, plaintiff had a meeting with Stout to further explain which days plaintiff would be unable to work and to advise Stout that McCormick intended to cover for plaintiff when plaintiff could not work. (Pl.'s counterstatement at 23). Stout indicated that she was comfortable with the arrangement between plaintiff and McCormick, but that Robert Frey at Saucon Valley would also have to approve. (Pl.'s counterstatement at 25). Stout also commented that she believed other employees would like to take off on Friday nights and Saturday mornings, and referred to plaintiff's religious beliefs and Holy Days as "weird." (Pl.'s counterstatement at 26).

Plaintiff discussed her conversion with Robert Frey at Saucon Valley, who was supportive and indicated a willingness to accommodate her new schedule. (Pl.'s counterstatement at 30). Frey never told plaintiff that Saucon Valley needed to have two ATCs on site at all times or that her job might be in jeopardy if she did not work on the Sabbath or Holy Days. (Pl.'s counterstatement at 32). Plaintiff did not work a Friday evening past sunset or a Saturday morning after August 19, 2008. (Pl.'s resp. at 29).

Plaintiff lived near the Saucon Valley campus and could fulfill her religious requirements to not work on the Sabbath by leaving work roughly ten minutes before sundown. (Pl.'s counterstatement at 21). During the fall sports season, the only Saucon Valley events that took place after sundown on Fridays were football games. (Pl.'s counterstatement at 21). Saucon Valley's football season lasted until October 30, 2008. (Pl.'s resp. at 36). In the spring, there are no sporting events at Saucon Valley that take place after dark. (Pl.'s counterstatement at 22).

Plaintiff's coworker and friend, Erin McCormick, struggled with the increased workload that came with her agreement to cover varsity football for plaintiff. (Defs.' statement at 30). On

5

October 1, 2008, Saucon Valley's Frey emailed OAA's Stout to express his concerns about the strain that plaintiff's absences put on McCormick and the rest of his staff. (Defs.' statement at 31). Frey also requested that Stout guarantee coverage on all Fridays, Saturdays, and additional Church of God Holy Days when plaintiff might be absent. (Defs.' statement at 31). Frey went on to write, "In no case do I believe any of us are in a position to discriminate against a religious belief and therefore I think we must be able to work around her needs at least to a considerable and respectable means..." (Pl.'s resp. at 31).

Plaintiff planned to take off of work to observe the Feast of the Tabernacles during October 2008. (Pl.'s counterstatement at 33). Before taking off, plaintiff came to OAA's offices on October 2, 2008 to meet with Stout and OAA's human resources director, defendant Maryanne Nastasee. (Pl.'s resp. at 33). Plaintiff asked to be absent on October 9, and between October 13 and October 21, for Holy Day observances. (*Id.*)

Nastasee told plaintiff that her religious observances were causing a problem and were not fair to OAA's other employees. (Pl.'s counterstatement at 33). Plaintiff said that she would do anything she could to preserve her job, including working extra hours in defendant's clinic, covering for ATCs on days besides the Sabbath, and paying for a replacement for the days she would miss. (Pl.'s counterstatement at 33). At no time did Stout or Nastasee indicate to plaintiff that she would lose her job if she took off from work to observe the Feast of the Tabernacles, although they were aware that she intended to be absent for more than a week. (Pl.'s counterstatement at 36).

During the October 2nd meeting, for the first time Stout and Nastasee asked Oakley to describe her religious practices and needs. (Pl.'s counterstatement at 34). Even before the

6

meeting, however, Stout knew that it was OAA's position that Outreach ATC's could not have unplanned time off; Stout had already discussed this issue with her supervisor, Hudson, when fielding a similar request for time off from a Jewish employee. (Pl.'s counterstatement at 37). The only religious holidays for which OAA closes and provides time off are Christmas and Good Friday. (Pl.'s counterstatement at 10).

Following their meeting with plaintiff, Stout and Nastasee met with COO Vincent Hudson to discuss the situation. (Pl.'s counterstatement at 38). Hudson's impression was that Frey was approving plaintiff's requests for time off but also complaining to OAA about a lack of coverage at Saucon Valley events. (Pl.'s resp. at 35).

To deal with plaintiff's impending absence, Stout called three or four candidates from a round of interviews six months prior to ask if they were available to fill in for plaintiff on a part time basis while she observed the Feast of the Tabernacles. (Pl.'s counterstatement at 38). Stout did not, however, contact any current Outreach ATCs to ask if they could provide coverage, or discuss options with the director of physical therapy, who managed the Clinical ATCs. (*Id.*) Stout did not believe that any Clinical ATCs had time to cover plaintiff's schedule, and did not feel comfortable asking Outreach ATCs from other schools if they could cover plaintiff's duties. (Pl.'s resp. at 36). She did not call or email the ATCs at large to ask for help. (*Id.*) OAA also chose not to place a classified advertisement to search for a part time employee to fill in for plaintiff. (Pl.'s resp. at 36).

Ultimately, Stout herself and an Outreach ATC from a middle school covered plaintiff's duties while she observed the Feast of the Tabernacles. (Pl.'s counterstatement at 40). During this time, there were two days during which only one ATC was on site at Saucon Valley. (*Id.*)

7

Nonetheless, Stout believed that Robert Frey was satisfied with the coverage arrangement. (*Id.*)

On October 7, 2008, Frey sent another email to Stout explaining that plaintiff had asked him for various days off in October, April and June, and requesting that OAA guarantee coverage on every Saturday morning on which Saucon Valley had multiple events. (Defs.' statement at 37). The parties disagree regarding the implications of Frey's request. Defendants believe that Frey asked for two ATCs on every Friday night and Saturday. (Defs.' statement at 38). Plaintiff argues that Frey was asking for staggered coverage, and that two ATCs would not be necessary if multiple events were not taking place. (Pl's resp. at 38). In any event, no one from OAA called Frey to ask how OAA could alleviate any strain on Saucon Valley's staff. (Pl.'s resp. at 42).

At some time after the October 7th email from Frey, OAA's Vincent Hudson considered how OAA could accommodate plaintiff's requests and religious practices on an ongoing basis. (Defs.' statement at 42). Hudson chose not to contact Saucon Valley to change the terms of the initial services agreement with OAA, as OAA would have lost money in the renegotiation and compromised its reputation for being able to provide promised services to its customers. (Defs.' statement at 51).

Hudson estimated that for plaintiff to have the substitute she sought OAA would need to pay between $15,000 and $20,000 in additional wages. (Def.s' statement at 45). Hudson was aware that plaintiff was willing to surrender some of her salary to off-set the cost of her accommodation. (Pl.'s resp. at 42). He was also aware that plaintiff offered to work in the OAA clinic to compensate for any burden placed on OAA by her request for accommodation. (*Id.*)

Beyond the expenses involved, Hudson believed that asking all of the Outreach ATCs about their availability to cover weekends and Holy Days would have been a burdensome and

8

fruitless effort. (Defs.' statement at 46). Hudson did not believe that any part time ATCs existed; even if they had, Hudson believed that having plaintiff reimburse OAA for the cost of substitutes would have been impractical, as it would have reduced her wages to $10,000 to $15,000. (Defs.' statement at 50). He also feared that Saucon Valley students and coaches would have been subjected to a revolving door of trainers and training styles, which would have diminished the quality of OAA's services and harm its reputation. (Defs.' statement at 47).

After plaintiff returned from the Holy Days, on October 23, 2008 she had another meeting with Nastasee at which she was told that she would either have to work during Sabbath or resign. (Pl.'s counterstatement at 41). Plaintiff reiterated that she would do anything she could to continue working for OAA, including taking reduced pay, working hours in the clinic, or filling in for other employees during morning shifts. (Pl.'s counterstatement at 43). At a follow-up meeting on October 27, Nastasee advised plaintiff to prepare a resignation letter, as there would be no "paperwork," and plaintiff would be ineligible to receive unemployment benefits. (Pl.'s counterstatement at 41-45). Plaintiff refused to prepare a resignation letter, but was instructed to no longer report to work at Saucon Valley. (Pl.'s counterstatement at 45).

Plaintiff was terminated following the October 27 meeting and replaced as of November 2, 2008. (Pl.'s counterstatement at 49). Hudson made the final decision to end plaintiff's employment. (Pl.'s counterstatement at 46). Hudson consulted with Nastasee and Stout, but did not speak to either plaintiff or any representatives from Saucon Valley. (Pl.'s counterstatement at 46).

OAA has limited experience with employees who observe the Sabbath on Friday nights and Saturdays. Stout was not aware if, in the course of her fourteen-year career, defendant had

9

employed any ATCs who observed a Judaic Sabbath. (Pl.'s counterstatement at 11). Defendant Vincent Hudson could only identify two Sabbath-observing Jewish employees among defendant's total employee corps of three hundred and sixty. (Pl.'s counterstatement at 12). When asked at her deposition if she understood that Jews typically observe the Sabbath from sundown on Friday through sundown on Saturday, Stout replied, " I don't know when I learned of what a Jew does." (Pl.'s counterstatement at 13). When considering how OAA might accommodate plaintiff, Stout never investigated how many events at Saucon Valley a Sabbath-observing ATC would have to miss during the 2008-2009 school year, given the variable nature of Friday and Saturday sundowns. (Pl.'s resp. at 37).

One Jewish Outreach ATC, Dan Sicher, had applied for and accepted a position in OAA's clinic so that he could more easily observe the Sabbath and Jewish holidays. (Pl.'s counterstatement at 35; Defs.' statement at 59). Sicher was originally an Outreach ATC, and approached Stout during his contract renewal period to ask if there was any way that he could work as an Outreach ATC while observing a traditional, Jewish Sabbath. (Pl.'s resp. at 59). Stout knew that the OAA contract and Sicher's proposed religious schedule were in conflict. (*Id.*)

## IV. Legal Analysis[2]

### A. Plaintiff's Claim for Disparate Treatment

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to

---

[2] Plaintiff's parallel claims under Title VII and the PHRA can be analyzed together, as the standards for such claims under the two statutes are the same. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

"discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of . . . religion." 42 U.S.C. § 2000e-2(a)(1). Plaintiff's claim that she was subject to disparate treatment because of her religious beliefs is analyzed under the familiar framework of the Supreme Court's decision in *McDonnell Douglas Corporation v. Green*. *Dodd v. SEPTA*, 2008 U.S. Dist Lexis 56301, at *10 (E.D. Pa. July 24, 2008) (citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)).

Plaintiff must first establish a *prima facie* case of discrimination, meaning that she is a member of a protected class; she was qualified to hold her position; she suffered an adverse employment action; and a similarly situated person outside of the protected class was treated more favorably, or the circumstances of the adverse action give rise to the inference of discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411 (1999); *Parsia v. Allied Tube & Conduit Corp.*, 2009 U.S. Dist. Lexis 23392, at * 32 (E.D. Pa. March 19, 2009). If a plaintiff can make out a *prima facie* case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the employment action. *Abramson v. Wm. Paterson College of N.J.*, 260 F.3d 265, 281-82 (3d Cir. 2001). The burden then shifts back to the plaintiff to offer evidence that the employer's proffered reason for the employment action was pretextual, and that the real motivation was discrimination. *Id.*

In this case, plaintiff has failed to make out a *prima facie* case because she has not produced evidence that a similarly situated employee outside of her religious community was treated more favorably than she was. Employees are similarly situated when they have similar responsibilities and are held to similar standards. *Milliron v. Pilot Travel Centers, LLC*, 2009 U.S. Dist. LEXIS 74351, at *29-30 (W.D. Pa. Aug. 20, 2009). Moreover, employees are

similarly situated when their conduct on the job–or misconduct–is similar in nature. *Dill v. Runyon,* 1997 U.S. Dist. LEXIS 4355, at *12 (E.D.Pa.1997) ("To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (*quoting Anderson v. Haverford College*, 868 F.Supp. 741, 745 (E.D.Pa.1994)).

In this case, plaintiff can point to no Outreach ATC who asked for Fridays and Saturdays off consistently and received them.[3] Dan Sicher, a Jewish Outreach ATC, completed his Outreach ATC contract and moved over to a clinical position so that he could observe the Sabbath. Mr. Sicher therefore switched positions for the express purpose of being held to a schedule and standard of work different than the one at issue in plaintiff's case. Plaintiff has no grounds to argue that while Mr. Sicher was under contract as an ATC he received treatment more favorable than that accorded to plaintiff. Because plaintiff can point to no similarly situated employee who received more favorable treatment, she has not made out a *prima facie* case of discrimination and summary judgment will be granted to defendant on her disparate treatment claim.

---

[3] Plaintiff briefly suggests that "similarly situated non Sabbath observant ATCs" were treated more favorably than she and Mr. Sicher were. (Pl.'s Br. at 20). Plaintiff has produced no evidence, however, that non Sabbath observant ATCs received discretionary days off for personal or religious purposes. She has thus provided no evidence that non Sabbath observant ATCs were treated more favorably than she was.

Plaintiff does note that the only religious holidays for which OAA closes are the Christian holidays of Christmas and Good Friday. If that commonplace practice were proof of religious discrimination, many businesses (not to mention the federal judiciary) would be in violation of Title VII. In addition, Plaintiff notes that at depositions, witnesses could only identify two Sabbath observant Jews out of OAA's three hundred and sixty employees. Standing alone, this fact is not evidence of discrimination. To the contrary, the Court of Appeals has held that employers must be aware of an employee's religious affiliation for discrimination to occur. *Geraci v. Moodv-Tottrup, Intern., Inc.* 82 F.3d 578, 581 (3d Cir. 1996).

**B. Plaintiff's Claim for Retaliation**

Plaintiff claims that her firing came in retaliation for her pursuit of an accommodation for her religious observances. Retaliation claims under Title VII also follow the *McDonnell Douglas* framework, meaning that a plaintiff must establish a *prima facie* case. To make a *prima facie* case of retaliation, a plaintiff must present evidence establishing that: (1) she was engaged in protected conduct; (2) an adverse action was taken; and (3) there is a causal link between the protected conduct and the adverse action. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). If plaintiff can make out a *prima facie* case, defendant must respond with a legitimate, non-discriminatory reason for the adverse action; the burden then shifts to plaintiff to prove that the employer's proffered reason was a pretext, and the real reason for the adverse action is retaliation. *Id.* at n.2. In this matter, even assuming that plaintiff has made out a *prima facie* case of retaliation, the parties dispute whether plaintiff has produced any evidence that defendants' stated reason for her termination–her unwillingness to work on the Sabbath and various Holy Days–was pretextual.

Plaintiff makes two arguments in support of her position that defendant's proffered reason for her termination was pretextual: she alleges that there are "blatant inconsistencies" in defendants' reasoning regarding plaintiffs' termination; and also evidence of "rampant discriminatory anti-Semitic evidence towards Old Testament Sabbath Observers." (Pl.'s Br. at 17). It is true that both direct evidence of discrimination and evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for plaintiff's termination would help her to meet her burden of rebutting OAA's defense. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Plaintiff's retaliation

13

claim fails because she did not produce evidence of either direct discrimination or of "incoherencies" in defendants' stated reason for her termination.

As to her first argument, plaintiff alleges that there are genuine issues of material fact regarding whether she refused to work, "which directly refute OAA's stated reason for her termination." (Pl.'s Br. at 17). Plaintiff is correct that the parties disagree about the nature of plaintiff's separation from the company, with plaintiff (and the Court, for purposes of evaluating this motion) characterizing the separation as a termination and defendants characterizing it as a product of plaintiff's decision not to honor her employment contract. Although the nature of the separation is ambiguous, however, defendants' rationale for the separation has been consistent.

OAA's stated reason for plaintiff's termination is that plaintiff "refused" to work on Friday nights and Saturdays before sundown. (Def.'s Br. at 12). Plaintiff did not "refuse" to work entirely, as she was eager to hold on to her position at Saucon Valley. She simply did not want to work on the Sabbath and Holy Days. There is also a question about whether defendants pressured plaintiff to resign so that her termination would create no "paperwork." These issues, however, pertain to defendants' efforts to accommodate plaintiff; they are not the kind of inconsistencies of logic that would provide support for a retaliation claim.

The Court is also not convinced that plaintiff has offered evidence of "anti-Semitic animus" at OAA. To support her claim, plaintiff alleges that defendant Stout made derogatory remarks about the "weird" holidays that plaintiff observed, and noted that many people would like to take off on Friday nights and Saturdays. Plaintiff also alleges that Stout made a "religious slur" during her deposition when Stout responded, "I don't know when I learned of what a Jew does" when asked about her knowledge of Jewish Sabbath observance.

14

The Court finds that these remarks, however awkward or offensive, are not enough to create an issue of material fact regarding plaintiff's retaliation claim. Even assuming that these remarks could be characterized as "slurs," the fact remains that the speaker, Stout, did not make the decision to terminate plaintiff. Vincent Hudson, who has not been accused of making any untoward remarks, made the decision. Stray comments from a non-decisionmaker are rarely given much weight in a Title VII case.[4] *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

**C. Plaintiff's Claim for Failure to Accommodate**

Title VII requires that an employer make a reasonable accommodation of an employees' religious beliefs and observances, unless doing so would result in "undue hardship" to the employer. *Shelton v. Univ. of Medicine & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000). An employer experiences an undue hardship when an accommodation would impose more than *de minimis* cost. *TWA v. Hardison*, 432 U.S. 63, 84 (1977).

In order to prevail on a claim for failure to accommodate under Title VII, a plaintiff must establish a *prima facie* case consisting of three elements:

1. She holds a sincere religious belief that conflicts with a job requirement;

2. She informed her employer of the conflict; and

3. She was disciplined for failing to comply with the conflicting requirement.

*Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 133-34 (3d Cir. 1986) (citations

---

[4] Moreover, plaintiff is not Jewish, and has failed to explain how or why she would be the target of anti-Semitic animus. Plaintiff does not argue that OAA retaliated against her for advocating on behalf of Jewish Sabbath observers.

omitted). Once an employee establishes a *prima facie* case, the burden shifts to the employer to show that it made good faith efforts to accommodate an employee's beliefs or that the requested accommodation would work an undue hardship. *See United States v. Board of Educ.*, 911 F.2d 882, 886-87 (3d Cir. 1990). In this matter, the parties do not dispute that plaintiff has made out a *prima facie* case. Defendants argue that they could not accommodate Plaintiff without undue hardship.

The magnitude of hardship caused by an accommodation is a fact-based inquiry. *Protos*, 797 F.2d at 134 (3d Cir. 1986). Higher wage costs can be one form of hardship that is more than *de minimis*; lost efficiency and employee morale can be another form. *Hardison*, 432 U.S. at 84; *Protos*, 797 F.2d at 133-34. For example, Plaintiff's suggestion that OAA renegotiate its contract with Saucon Valley–and presumably reduce the amount of revenue it took in from the school district–would almost certainly result in more than *de minimis* losses.

Even leaving aside plaintiff's argument that Hudson's affidavit was somehow inconsistent with his deposition testimony, there are still issues of material fact to be resolved regarding OAA's capacity to accommodate plaintiff. Plaintiff has produced evidence that could, when considered by a jury, rebut the examples of undue hardship harm that defendants put forward.

Defendants have proffered evidence that accommodating plaintiff's religious observance would have resulted in higher wage costs estimated to be between $15,000 and $20,000. Defendant Hudson also believed that it would have been impractical to

16

accept plaintiff's offer to reimburse OAA for the cost of finding a replacement for her, as plaintiff's salary would have been reduced to an unworkable level and she would have been compelled to leave the company.

Plaintiff can point to an issue of material fact, however, regarding how much OAA would have had to pay in extra wages to accommodate her religious practices. Plaintiff offers evidence that trainers who took on extra work in OAA's Sunday clinic were routinely paid $35. Even assuming that the $35 rate was an hourly wage, the $20,000 that defendants estimated would have been required to replace plaintiff would have purchased more than five hundred hours of labor.

There is a further dispute about the amount of time that OAA would have had to cover in order to accommodate plaintiff. The record does not make clear how many Friday night and Saturday morning events plaintiff would have had to miss over the course of the year; no one at OAA checked with Saucon Valley to determine the extent of the district's weekend scheduling for the winter and spring athletic seasons. Moreover, it is also unclear how many Friday night events would have interfered with plaintiff's religious practices, given that the time of sundown and Sabbath observance changed with each season. Finally, the parties disagree as to whether Saucon Valley demanded that two ATCs be on-site on all days, or only on days when multiple athletic events took place.

Because issues of material fact remain regarding the number of hours of substitute staffing that would actually have been needed to accommodate plaintiff, the Court cannot conclude as a matter of law that OAA would have been unduly burdened by the cost of that substitution. Similarly, the Court cannot conclude that plaintiff's offer to reimburse

17

OAA for the cost of hiring a substitute would have proven unworkable.

OAA also argued that the quality of patient care that it offered might suffer, and its reputation as a provider might suffer, if it subjected Saucon Valley's students and coaches to a revolving door of trainers. OAA's position is that no part time trainers were available, and that to fulfill plaintiff's requests for time off, it would have had to scrape together a list of full-time trainers committed to other districts who happened to be free on Friday nights and Saturdays. Defendant Stout expressed concern that, in addition to diminishing the quality of care offered, it would not have been fair to ask other trainers who happened to be free on the weekend to fill in for plaintiff on an inconsistent basis.

Plaintiff has produced some evidence, however, that OAA does have part time ATCs who spend part of their time with middle school clients and the rest of their time working with patients in the clinic. The Court cannot say, as a matter of law, that no part time employees could have been redeployed to both accommodate plaintiff and to provide consistent care for Saucon Valley stakeholders in a manner that had no deleterious effect on the morale of other trainers.

Moreover, the Court notes that plaintiff has produced evidence that her supervisor at the school district, Robert Frey, was supportive of her and indicated a willingness to accommodate plaintiff. This support creates an issue of material fact regarding OAA's concern that its reputation would suffer.

These issues of material fact make it impossible for the Court to conclude that no reasonable jury could find in plaintiff's favor. As a result, defendants' motion for summary judgment on the failure to accommodate claim will be denied.

18

## V. Additional Issues

Defendants seek to enforce the liquidated damages clause found in plaintiff's employment contract, through which plaintiff might be compelled to pay 20% of her salary if she failed to fulfill her employment contract. Plaintiff argues that her position at OAA was empty for only a few days, and that OAA's actual damages were therefore significantly lower than the amount currently sought. Since there appears to be a genuine issue of material fact, the validity of defendant's counterclaim will be reserved for the jury.

Finally, plaintiff alleges that she was subject to a hostile work environment, and that the individual defendants aided and abetted discrimination against her. Other than a footnote by each, the parties did not brief these issues. Accordingly, I will not decide whether these claims are viable.

An appropriate Order follows.